[Civil No. 4203. Filed September 29, 1941.]

[117 Pac. (2d) 96.]

In the Matter of the Estate and Guardianship of FREDIE LEE SORRELLS, ROBERT LESLIE SORRELLS, MILDRED REX SORRELLS and JOSEPH AHIRA SORRELLS, Minors; JOSEPH AHIRA SORRELLS, Appellant, v. LAURA S. BERGIER, Appellee.

Mr. Duane Bird and Mr. Thomas L. Hall, for Appellant.

Messrs. Duffy & Robins, Messrs. Darnell, Pattee & Robertson and Messrs. Conner & Jones, for Appellee.

LOCKWOOD, C. J.—This is an appeal by Joseph Ahira Sorrells, hereinafter called the minor, from certain parts of an order and judgment settling the final account of Laura S. Bergier, hereinafter called the guardian, and a cross-appeal by the guardian from certain other portions of said order.

A motion to dismiss the appeal was filed by the guardian on the ground that it was not taken within the sixty days permitted by the statute, sec. 21–1801, Arizona Code, 1939. The order appealed from was made on March 11, 1939, and a motion for new trial

was filed by the minor, which was overruled on May 1, and notice of appeal was given on June 29. It thus appears that the notice of appeal was given within sixty days after the overruling of the motion for new trial, but much more than sixty days after the making of the order appealed from. Section 3659, Revised Code 1928 (sec. 21–1702, Ariz. Code 1939), under which the appeal was taken, provides in paragraph 3 that appeals may be taken "From a judgment or order . . . settling an account of an . . . guardian . . . " The notice of appeal is from "the following parts and portions of that certain order and judgment rendered in said court in the above entitled cause on the 11th day of March, 1939," and the order and judgment referred to in the notice is clearly an order settling the final account of the guardian.

It is the contention of the guardian that the rule laid down by this court that the time to appeal from a judgment in a civil action does not begin to run until after a motion for new trial is disposed of does not apply to appeals from probate orders of the kind involved herein.

██ This court has apparently never passed on the precise point raised, but after a careful review of our statutes and the authorities from other states, we are of the opinion that a motion for a new trial may be made in probate proceedings like this, and that the time for appeal under such circumstances is governed by the same rule as an appeal in ordinary civil matters. Section 4171, Revised Code 1928 (sec. 38–2007, Ariz. Code 1939). The motion to dismiss the appeal is, therefore, denied.

The record in the case is extremely voluminous, but the material facts bearing upon the issues which must be decided are in little conflict, except as to one important matter which we shall point out and discuss at the proper time. These facts may be stated as fol-

lows: Mrs. A. B. Sorrells had three sons, commonly known as Bert, Roy and Ray, and three daughters, one of whom was Mrs. Laura S. Bergier, the guardian in the present proceeding. The three brothers were partners in the cattle business, under the name of Sorrells Brothers, Bert owning a half interest therein, the other half being owned by Roy and Ray. Bert died in 1918, leaving a daughter and three sons, Joseph Ahira, the youngest, being the minor named in this action. The estate of Bert Sorrells was duly probated, and on January 7, 1920, Otto H. Herold was appointed guardian of the estate of the four minor children.

On November 1, 1920, the superior court of Santa Cruz County, which had jurisdiction at all times of the probate proceedings, authorized Herold, as guardian, to invest $21,500 of the estate of the wards in the purchase from Roy and Ray Sorrells, the uncles of the minors, of forty-five hundred acres of land which was part of a larger area of grazing land, and was subject to a mortgage of about $129,000. At the time this land was purchased under the order of the court, Roy and Ray, and their respective wives, executed an agreement with the guardian which provided that they would pay and discharge the mortgage when it became due, and in case of default would pay to the guardian the full sum of $21,500, as aforesaid, together with any costs incurred in enforcing the agreement. It is agreed that this $21,500 was part of the estate of the three sons of Bert Sorrells, the estate of his daughter not being involved in this purchase in any manner. About three years later the mortgage in question was foreclosed, and the minors thus lost the land for which their guardian had paid the $21,500. In the meantime Ray Sorrells had died, and Herold filed suit against Roy and his wife, and against Ray's widow both individually and as administratrix of her

husband's estate, upon the agreement of reimbursement above referred to. All of the cattle belonging to Roy and Ray were also subject to a mortgage held by the First National Bank of Nogales, and this was foreclosed about the same time, Ray and Roy thus losing all of their grazing lands and cattle, which were their principal, if not only, assets. After this debacle there was remaining, among other things, as assets of Joe Sorrells' estate, about one hundred head of cattle. Herold petitioned the court for authority to sell the cattle, and published the usual order to show cause. At this time the cattle market was in a very depressed condition and the cash sale value of these cattle very low. Mrs. Bergier, the present guardian, attempted to save the cattle from sale and an arrangement was finally made with Mrs. A. B. Sorrells, the grandmother, and Ray Sorrells' widow, Ozella, to handle the cattle of the minors under certain conditions, and the sale did not take place.

About this time Herold desired to resign as guardian. The court, therefore, appointed Mrs. Bergier in that capacity. Relations between the minors and their own mother had become somewhat strained, due to her remarriage, and the children were living with other relatives, among them the guardian and Roy Sorrells. This appointment of Mrs. Bergier as guardian was approved by all of the interested parties who, under the law, were capable of indicating their preference. When Herold filed his final report as guardian, Mrs. Bergier filed exceptions to the report, assigning as a ground therefor that Herold had breached his trust as guardian by investing the funds of the wards in mortgaged land. The matter came on for trial and a judgment was rendered denying the exception. This judgment eventually became final and is *res adjudicata* so far as any action against Herold or his bondsmen is concerned.

When Mrs. Bergier finally became guardian she received from Herold as the estate of Joe Sorrells the one hundred head of cattle, a partial interest in a certain Liberty Bond, $848 in cash, and the interest of the minor in the lawsuit against Roy and the estate of Ray Sorrells above referred to. At this time Roy had practically no assets and was heavily in debt to an amount far beyond his then ability to pay. His brother Ray, who had died, left only an estate of a homestead, which was exempt from execution under the federal law, and certain life insurance payable directly to his widow, which was also exempt from execution. Any judgment against Roy Sorrells or the estate of Ray would at that time have been uncollectible. Roy, however, thought that he would be able to make arrangements to get back into the cattle business, and, as a matter of fact, did so. He then took charge of the cattle of the minor and handled them, together with his own, from 1924 up to 1928, when they were sold. As a result of his handling of the cattle they produced enough above the cost of running them to pay living expenses of the minor amounting to nearly $6,000, and left approximately the same sum in cash on hand with the guardian. The one hundred head of cattle, therefore, which belonged to the minor and which were worth at most $2,000 when the guardian took them over, produced during the period which she held them more than $11,000 net for the estate of the minor. During all this time the suit against Roy Sorrells and the estate of Ray remained in abeyance, at the request of the guardian, until January 7, 1929, when it was dismissed for want of prosecution.

In September, 1929, Roy Sorrells died and his estate was probated. It was inventoried and appraised at some $17,000, but two years after his death it had increased in value to approximately $40,000. It is true he owed a large sum of money at the time of his death,

but most of this was covered by life insurance. The guardian did not present any claim against the estate on account of the agreement on which the suit had been brought. The other minor children of Bert Sorrells became of age from time to time and settled their accounts with the guardian without any difficulty. At the time the suit against Roy was dismissed the guardian had on deposit in the Nogales National Bank something over $7,500 belonging to the estate of the minor, of which there remained on deposit $6,100 in a savings account and $416.01 in a checking account when the bank closed in 1931, and a large portion of this was eventually lost to the estate.

After the minor became of age, the guardian filed her final account and report, and exceptions were taken thereto by the minor. The principal exceptions were, first, that she had improperly dismissed the suit in question and had thereby caused a loss to the estate of the minor of his one-third of the $21,500 which formed its basis, and, second, that she had been guilty of negligence in leaving the money on deposit with the Nogales National Bank. After several amendments of the account and voluminous pleadings on both sides, the issue was finally heard before the court sitting with the advice of a jury. At this time the guardian offered in defense of her dismissal of the suit as aforesaid evidence of certain alleged facts whose existence and legal effect, even if true, were most bitterly disputed by the minor. They were, in substance, as follows: In 1924 when, as we have stated, Roy Sorrells was without any assets of material value and heavily indebted, and the estate of Ray Sorrells was also of nominal, if any, value, Roy stated to the guardian that his condition was such that if she pressed the suit he would be compelled to go into bankruptcy, and would do so, and any judgment she might obtain would be worthless, but that if she would refrain from so

doing she would take the cattle of the minor and run them under certain conditions agreed upon, and thus build up their value until they were worth more than the amount of any judgment which could be realized, and that if he did this the suit was to be dismissed. She agreed to accept his offer and contended that it was as a result of this agreement and the successful building up by Roy Sorrells of the cattle herd of the minor to a far greater value than his share of the indebtedness sued on that the suit was dismissed. In legal parlance, she set up a compromise of the suit which she claimed was in the best interests of the minor. This compromise was not formally approved by the probate court either in advance or subsequently thereto, until the hearing on the settlement of the final account, though the guardian contended that the probate judge had approved it orally at the time it was made. Considerable evidence in support of this claim of the guardian was presented, over the objection of counsel for the minor. Three interrogatories were submitted to the jury, which read as follows:

"1. Did Mrs. Bergier, the guardian, shortly after her appointment as guardian and in the month of January or February of 1924 make an agreement with Roy Sorrells in regard to Joseph Ahira Sorrells' property as set forth in her amended and supplemental report?"

"2. Did Laura Bergier act in good faith and reasonable prudence in the matter of her claim as guardian against Roy Sorrells, Hazel Sorrells, Ozella Sorrells, and Ozella Sorrells as Administratrix of the estate of J. R. Sorrells, deceased?"

"3. If Mrs. Bergier did make the agreement with Roy Sorrells, referred to in interrogatory No. 1, did Joseph Ahira Sorrells suffer any loss by reason of such agreement and not prosecuting the action instituted by Otto H. Herold, as guardian, against Roy Sorrells, Hazel Sorrells, Ozella Sorrells, and Ozella Sorrells as administratrix of the estate of J. R. Sor-

rells, deceased, being a case in this court numbered 1466?''

and were answered unanimously by the jury ''yes'' to the first two, and ''no'' to the third. These findings were later approved and accepted by and made the findings of the court, and as a result the attempted surcharge of the account with the minor's claim against Roy Sorrells and the estate of Ray Sorrells was overruled.

The second exception went to the deposit of the money in the Nogales National Bank. The court found that the deposits were made in good faith and with reasonable prudence, but that, as a matter of law, the guardian should be surcharged with the amount in the savings account at the time the bank closed, together with 3% interest, amounting to $4,855.88. The court further, over the objections of the minor, allowed $1,400 as reasonable compensation to the guardian for her services over the period in question, and $1,000 as attorney's fees for defending her final account, and after striking a balance on the various charges and credits surcharged her with the sum of $1,990.20, with 3% interest thereon from October 15, 1937.

The questions for our determination on the appeal, on this state of the record, may be stated as follows: (a) Did the trial court commit reversible error in admitting the evidence objected to in regard to the alleged compromise agreement aforesaid offered by the guardian; (b) if it did not, was there sufficient competent evidence to sustain the finding of the trial court that the agreement as aforesaid was made, and that the guardian in making it and dismissing the action in question acted in good faith and with reasonable prudence; (c) did the estate of the minor suffer any loss by reason of her action in such compromise; (d) if her conduct in the premises was in

good faith and reasonable prudence, did the trial court, as a matter of law, have a right to refuse to surcharge her account with any of the amounts involved in said action; and (e) did the trial court err in allowing the guardian compensation and attorney's fees as above set forth?

On the cross-appeal the sole question is whether the trial court erred, as a matter of law, in surcharging the account of the guardian with the amount on deposit in the savings account in the Nogales National Bank at the time it closed, as above set forth.

The first question is as to the action of the court in admitting certain evidence over the objection of the minor. This evidence concerns the alleged compromise agreement, and while there are numerous specific objections thereto, they may be divided into four classes. The first concerns testimony going to the making of the agreement, and consists of statements by parties who claimed they were present when it was made. The second involves statements in regard to conversations had with the then probate judge. The third consists of testimony as to alleged admissions or declarations in regard to the agreement made by Roy Sorrells in the presence of third parties. The fourth is the testimony given by the court reporter as to evidence given at a former trial by a witness since deceased.

So far as the testimony in regard to the making of the agreement, given by witnesses who were present at the time it was made, is concerned, the objections thereto were properly overruled. Certainly parties who actually hear an oral contract made may be permitted to testify to that fact.

The second class refers to conversations with the probate judge in regard to the alleged agreement. If these conversations were offered for the purpose of proving that the judge did legally approve the com-

promise before it was actually consummated, they would, of course, be inadmissible, but one of the issues involved in the case is the good faith of the guardian in making the compromise. Testimony that she had consulted the probate judge in regard thereto would be relevant and material on her good faith, even though the result of such consultation was not a valid order of approval.

The third class is alleged statements or admissions made in regard to the agreement by Roy Sorrells after it had been made. This, of course, is hearsay testimony, and under the ordinary rule of evidence is not admissible. There is an exception, however, to that rule which applies to admissions against interest when the party making them is dead at the time of the trial. 22 C. J., §§ 209, 210 and notes. Nor is the existence of the rule disputed by the minor. He insists, however, that such evidence is, only admissible when the admission is one against the interest of the declarant, and that in the present case the alleged statements, even if made, were self-serving declarations. Upon an examination of the record, we think this objection is well taken. Any declarations by Roy Sorrells to the effect that he had compromised an admitted indebtedness was certainly not a declaration against interest but rather a self-serving one. If the case were one wherein the verdict of the jury was binding upon the court, we think it would be our duty to send the case back for a new trial, for while there was sufficient competent legal evidence to prove the existence of the alleged compromise agreement, it might well be that the improperly admitted testimony was what turned the balance on this issue in favor of the guardian. In cases of this nature, however, the verdict of the jury is not binding upon, but merely advisory to, the court, and it may adopt the verdict in whole or in part as being

its findings, or reject it entirely and make its own findings of fact, and it is upon the findings made by the court, and not on the verdict of the jury, that the judgment is based. The only requirement of the law is, as we have said in a previous case, "While the court need not heed the advice of the jury, it must harken to it." *Stukey* v. *Stephens,* 37 Ariz. 514, 295 Pac. 973, 974.

We have repeatedly held that when a case is tried to the court alone, even though evidence was improperly admitted, if there is sufficient legal evidence to sustain the findings and judgment, we will assume that the court disregarded the improper testimony in reaching its conclusion, and that the case will not be reversed on account of the admission of such testimony. *Shannon Copper Co.* v. *Potter,* 13 Ariz. 245, 108 Pac. 486; *Hoover* v. *Odle,* 31 Ariz. 147, 250 Pac. 993; *First Baptist Church* v. *Connor,* 30 Ariz. 234, 245 Pac. 932. We think, in reason, the same rule should apply when the verdict is merely advisory for it is the finding made by the court, and not the verdict of the jury, which determines the judgment, and that the admission of improper testimony in such a case is not sufficient to reverse it for a new trial if there is sufficient legal evidence in the record to sustain the findings and judgment of the court.

There had been a previous trial of the case at which Elizabeth Sayre, a sister of the guardian, had testified and her evidence was taken by an official court reporter but not transcribed. Mrs. Sayre had died and at the instant trial the court reporter read from her notes of the previous testimony, but did not transcribe them and formally certify them in writing to be correct. Section 4415, Revised Code 1928 (sec. 23–106, Ariz. Code 1939), reads as follows:

"*Transcript of testimony may be read when witness dies or is absent.*—Whenever in any court of

record the testimony of any witness in any civil action shall be phonographically reported by an official court reporter and certified by him to be correct, and thereafter said witness shall die or be beyond the jurisdiction of the court in which the action is pending, and his absence is not procured by the party offering the evidence, either party may read in evidence the testimony of said witness in any subsequent trial of or proceeding had in the same action, subject only to the same objection that might be made if said witness were upon the stand and testifying in open court.''

It is apparently contended by the minor that only a written transcript of the reporter's notes, certified thereto in writing, is admissible, and that the reporter who took the notes is not permitted to read directly from his notes. It seems to us that such an objection is rather technical. Any written transcript must necessarily be dependent upon the original notes and its correctness dependent upon the ability and the honesty of the reporter in correctly transcribing them. It would seem to us that when the reporter testifies under oath as a witness and reads directly from her notes, this is in substance, if not in letter, a compliance with the statute. We think this testimony was not objectionable because it was offered in the manner referred to. The objections as to its competency are governed by what we have said in regard to the other classes of evidence. This disposes of question (b) for there was sufficient competent evidence to sustain the finding of the court that the agreement was made, and that the guardian, in making it, acted in good faith and with reasonable prudence.

There was also ample evidence to sustain the finding that the estate of the minor did not suffer loss by reason of the compromise. Since a judgment against Roy Sorrells and the estate of Ray Sorrells would have been uncollectible at the time the compromise was made, for the reason that Roy would have

gone into bankruptcy, and there were no assets in the estate of Ray subject to the judgment, then such judgment would have been worthless. The evidence justifies the presumed finding that this was the situation. On the other hand, there is evidence that through the efforts of Roy Sorrells from 1924 to 1928, and as a result of the compromise, the value of the minor's cattle was increased from not over $2,000 to $11,000, making a net gain of more than his share of any possible judgment, even if collectible, would have amounted to.

 This brings us to the question of whether, assuming that the compromise agreement was made with reasonable prudence and in good faith, the failure of the guardian to secure the approval of the trial court thereto before its execution renders it void, so that it could not be approved in the settling of her final account. We have examined carefully the cases cited by both counsel, and it would extend this opinion to an unreasonable length to analyze and discuss them. We are satisfied that the law of Arizona is that if a guardian secures the approval of the probate court in advance to a disposal of the ward's funds, such disposal may not be questioned, except for fraud, in a settlement of the guardian's account. But if such approval is not secured in advance, it is incumbent upon the guardian to show affirmatively that he acted in good faith and with reasonable prudence in making such disposal, and a subsequent approval by the probate court can only be made if such good faith and prudence affirmatively appears in the record. This reasonable prudence, of course, is tested by the judgment of a reasonable man under the circumstances, as determined by the court and not by the opinion of the guardian. The trial court found that the conduct of the guardian was in good faith and was in consonance with reasonable prudence. It, therefore, did not err

in refusing to surcharge the guardian with anything on account of her dismissal of the suit against Roy Sorrells and the estate of Ray Sorrells as above referred to.

 We next consider the allowance of compensation and attorney's fees. The rule of law is that a guardian is entitled to reasonable compensation for his services, and that this is peculiarly within the discretion of the probate court, and its action therein will not be reviewed except for an abuse of discretion. Section 4130, Revised Code 1928 (sec. 42–124, Ariz. Code 1939). In this case the guardianship extended over a period from 1922 to 1939, and for the most part was an active and not a passive one. In view of the time and the amounts involved, we cannot say that the amount allowed was so excessive as to be an abuse of the discretion of the trial court. The same is true in regard to attorney's fees. It cannot be questioned that where a guardian is forced to defend a final accounting a reasonable attorney's fee may be allowed. *Nagle* v. *Robins*, 9 Wyo. 211, 62 Pac. 154, 796; sec. 4130, *supra*. The amount of this is again within the discretion of the trial court. In view of the success of the defense in the lower court and the amount of labor expended both there and in this court on appeal, we cannot say the amount allowed is excessive. That portion of the order of the trial court appealed from by the minor is, therefore, affirmed.

 We consider next the cross-appeal of the guardian, which involves the surcharge of her account with the net proceeds of the money on deposit with the Nogales National Bank, which was lost by reason of the bank's failure. It is admitted by both parties that the law in Arizona on this point is laid down in the case of *Hammons* v. *National Surety Co.*, 36 Ariz. 459, 287 Pac. 292, 295. Therein we held:

" . . . It is the ordinary rule of law that in the absence of statute a guardian may make a temporary deposit of his ward's funds in a bank which he has reasonable ground to believe solvent, while he is seeking an investment or using the funds for legitimate current expenses. [Citing cases.] There it nothing in the statutes of Arizona contrary to this rule so far as funds of the class in question in this case are concerned.

"It is, however, almost universally held that a guardian may not make an unsecured loan of his ward's funds, no matter how responsible he may have cause to think the debtor is. [Citing cases.] It is stipulated that the deposit was an unsecured loan to the bank, and such being the case, it was without authority of law, and the borrower knowing the funds belonged to the estate of minors, held the money in trust. [Citing case.]"

The issue then turns upon the question of whether the deposit, under all the circumstances shown by the evidence, was merely a temporary deposit while the guardian was seeking a proper investment, in a bank which he had reasonable ground to believe solvent, or whether it was an unsecured loan to the bank. The court found, and there is evidence to sustain the finding, that the money was deposited in good faith in a bank which the guardian had reasonable ground to believe was solvent, and that it was left there because she reasonably believed she could not find a better investment for the ward's funds before the bank was closed. This finding is, of course, binding upon us, and it would seem that the Hammons case, *supra,* settles the rule that upon such a state of facts the guardian's account could not be surcharged because, unfortunately, the bank became insolvent before the funds were withdrawn. The minor urges strenuously that we have repeatedly said that the relation between a bank and a depositor is that of debtor and creditor, and that it, therefore, follows the deposit

was an unsecured loan to the bank and came within the rule applied to such a situation. We think the minor has misconstrued the meaning of the word "loan" as used in that case. Not every relation of debtor and creditor involves a loan of money by the latter to the former. If every deposit in a bank is an unsecured loan by the depositor to the bank, within the meaning of the Hammons case, there can never be a situation existing within the first rule laid down therein. In that case it was stipulated that the deposit was an unsecured loan and the judgment rendered therein necessarily followed. In the present case, however, the deposit was made in the usual manner, and it is stretching the word "loan" unreasonably to say that every such deposit involves an "unsecured loan" within the rule of the Hammons case.

Since the findings of the trial court are that the deposit was made in good faith and with reasonable prudence pending a better investment, we are of the opinion that it erred in finding that the account of the guardian should be surcharged with the sum lost from the savings account by the failure of the bank.

There are other assignments of error, but in view of what we have said it is unnecessary to discuss them.

The portion of the order involved in the cross-appeal is reversed and the case remanded with instructions to enter an order settling the final account in accord with the principles laid down herein.

McALISTER and ROSS, JJ., concur.