441 P.2d 561

In the Matter of the ESTATE AND GUARDIANSHIP OF Penni PURTON, a Minor.

Penni Purton WINCH, Appellant,
v.
Winifred Purton FONG, Appellee.
No. 2 CA–CIV 471.

Court of Appeals of Arizona.
May 29, 1968.

Rehearing Denied June 26, 1968.
Review Denied July 12, 1968.

528

Wolfe & Greer, by John Greer, Tucson, for appellant.

Miller & Pitt, by Robert F. Miller, Tucson, for appellee.

MOLLOY, Judge.

This appeal brings into question the effect of ex parte orders entered by the court in a guardianship authorizing the guardian to withdraw certain monthly sums from the guardianship account for the support, maintenance and care of a minor.

The subject guardianship was established in 1958 for a minor child, Penni Purton, then of the age of 12 years. Her mother was appointed her guardian. The purpose of the guardianship was to administer approximately $3,000 which the child had inherited from an aunt. A first account and report was filed and approved by the court in October of 1958, which indicated there was $2,677 on hand after payment of the allowed costs. There were no further accounts until a "Final Account and Re-

port" was filed in October of 1966, which accounting is the subject of this appeal.

There was no order entered by the court to provide for the support of the minor child until March of 1961. In the interim, by ex parte orders, the additional expenditures for attorney's fees were approved in the total sum of $325 and in March of 1959, the court authorized the investment of $2,200 in the purchase of an undivided one-half interest in a home to be purchased by the minor and her mother. When there was a total of $563.94 remaining in the estate, the court entered the first support order on March 17, 1961, in the sum of $50 per month.

In April of 1961 (in the next month), a petition filed with the court indicated the minor had inherited an additional sum of approximately $21,000 through the death of her father, and a new order was secured from the court authorizing the sum of $200 per month for the support of the minor commencing with the month of April. In December, of 1961, this was increased by ex parte court order to $250 per month.

After the purchase of the home in 1959, it was occupied by the mother, the minor, and a half sister, Kim Lona Fong, who was the child of the mother and a second husband. For a short time, the home was also occupied by this second husband, who died in November of 1959, and by a niece of the mother. Kim Lona inherited certain property, the nature and extent of which is not disclosed by this record, from her father.

The mother and the two daughters continued to occupy the home purchased until October of 1963, when Penni left home to go to Hartford, Connecticut to attend school. Certain tuition and travel expenses were paid by the mother for Penni until approximately April of 1964, at which time Penni took a job and became self-supporting. She subsequently married in July of 1964. The only expenditures by the mother for the benefit of the daughter after April of 1964 consisted of the purchase of airline transportation for the daughter to come home on a visit in June of 1964, various telephone calls and small gifts, and whatever benefit Penni received from amounts expended upon the home, which the mother and the second daughter continued to occupy until December of 1966.

Despite the fact that the mother knew Penni had no intention of returning home after the visit in June of 1964, and was receiving no support from her mother, the mother continued to withdraw the sum of $250 per month from the estate to and including April 1, 1965. In March of 1965, the mother secured an order of the court authorizing the expenditure of $150 for a new roof on the home, and authorizing the withdrawal of $118.50 per month. $68.50 of this sum was represented in the ex parte application to be for one half of the monthly mortgage payments and $50 to be the "reasonable cost of maintenance" of a one-half interest in the home. At the trial of this action, it developed that this latter sum was to compensate the mother for her personal efforts in caring for the property.

On appeal from the order approving the final account filed in October of 1966, the parties take completely diverse views as to the substance of the order approving the account. This arises from the dual nature of the accounting filed, which uses two systems to account. One is based upon the orders of the court authorizing expenditures, without any breakdown of amounts withdrawn. This first method of accounting shows an excess of receipts over withdrawals of $10,313.41, which amount is indicated by the report to be in a guardianship bank account "available for immediate distribution" on court order.

The other system of accounting is based upon actual expenditures, going back to the commencement of the guardianship in 1958. In this system, Penni's estate is charged with (1) one half of all mortgage and maintenance payments on the home, (2) one third of all utility bills, church donations, and groceries, and (3) amounts for medical, travel, clothes, entertainment, education and

miscellaneous. This detailed accounting is divided into two segments, the first covering the period prior to death of Penni's father and the court order of March 1961, and the second, the period elapsing between March 1961 and July 1966, when Penni attained majority.

Prior to the March 1961 support order, the account indicates the mother expended $3,021.81 more for Penni than the amount of support received from her father ($3,200). From March 1961, expenditures shown were less than the amounts claimed to have been withdrawn under court order by the total amount of $457.76. The deficiency between amounts actually expended and those withdrawn under court order for the 1961–1966 period is subtracted from the excess of expenditures claimed during the 1958–1961 period and the detailed accounting is summarized in this language: "Excess of Actual Support Expenses over Reimbursement Received $2,564.05."

The first final account filed made claim for reimbursement for this $2,564.05, along with claims for expenses of administration, which included a $1,000 fee for the guardian, attorney's fees in the sum of $850 and an accountant's fee in the sum of $450. In this account, the guardian stated that the mortgage on the home was in default, and foreclosure imminent and that the guardian offered to convey to the daughter without consideration her one-half interest in the property. It was also stated this offer would remain open for an "indeterminate" time.

After objections to this account were filed, the mother filed an amended final account, which "adopted by reference" the original account, but made modifications, principally as follows: (1) the amended account indicated that by stipulation of counsel, $500 had been distributed to Penni and $987.56 paid on the delinquent mort-

gage, (2) it asked for additional compensation for attorneys and the accountant by reason of the contested litigation about to ensue, (3) it made no mention of the offer to convey real estate to the ward and (4) it made claim for the mother "in her capacity as guardian of Kim Lona Fong" in the sum of $2,563.05 for expenditures made on behalf of Penni.

It was over this last claim that much of the testimony before the trial court revolved. At this trial, the mother made it clear that the only reimbursement claimed was for moneys of her other daughter which had been allegedly spent on Penni, prior to March of 1961. The mother categorically disclaimed any credit for her own moneys expended on Penni's support and stated that her second husband had paid for some of Penni's expenses prior to his death, but that no claim was made for these expenditures.

At the conclusion of the trial, the judge ordered, by minute entry, that:

" * * * the accounting be approved except for the item of 'house maintenance' wherein $50.00 per month commencing with July 1964 is charged for the guardian's service, which sum continues through July 1966—being a total of $1,250.00 which is disallowed."

The court thereupon ordered that the " *. * * request for moneys advanced to [sic] Winifred Purton Fong, as guardian of the estate of Kim Lona Fong is approved except that the sum of $2,563.05 is reduced by a figure of $1,250.00." [1]

Subsequently, the trial court, after motion for new trial, entered a minute order finding that $1,438.60 of the $3,021.81 (purportedly expended on Penni out of the estate of Kim Lona Fong in excess of support payments from Penni's father) had been expended during a time when there was no Kim Lona Fong estate (prior to November

1. It is assumed by all counsel on appeal that the $1,250 deduction from the claim of the mother as guardian of Kim Lona is because of the disallowance of the mother's personal claim for compensation for maintaining the home. The record reveals no explanation as to why these two items, separable as they are, should be offset one against the other.

of 1959), and that the guardian therefore should not be allowed to "offset" $1,438.60. The court in this same order thereupon "vacated" the order allowing $1,313.05 (difference between the claimed $2,563.05 and the $1,250 disallowed) to the mother as guardian of Kim Lona, and decreased the guardian's fee of the mother from $1,000 previously allowed by the sum of $125.55 (difference between $1,438.60 and $1,313.05).[2]

After these minute orders, the court entered a written order on July 5, 1967, in which it "approved," without any exceptions or disallowances, the "First Amended Final Account and Report," and ordered the payment of the following:

| | |
|---|---:|
| To the mother for guardian's fee. | $874.45 |
| To the mother's counsel for fees incurred for representing the guardian " * * * up and until the guardianship matter became contested." | 600.00 |
| For attorney's fees after the matter became contested. | 850.00 |
| To a certified public accountant employed by the mother to file the account and to testify at the trial. | 700.00 |
| Appraiser's fees. | 30.00 |
| As and for costs incurred in contest arising out of the account. | 32.50 |

"[T]he balance remaining" in the guardianship account was ordered to be paid to Penni, and, upon such payment, it was ordered that the mother would be discharged as guardian.

On the basis of this record, it is understandable that counsel do not agree as to the substance of the order of July 5, 1967, from which appeal is taken to this court. The appellant-daughter complains that the claim of the Kim Lona Fong estate was wrongfully allowed, and that the court wrongfully allowed many of the items detailed in the second system of accounting. The appellee-mother without meeting head-on these contentions, takes the position that the " * * * only monies withdrawn from the ward's guardianship account were those authorized by Court order," and that "[e]fforts on the part of the guardian to be allowed this differential [between amounts actually spent on Penni and the amount allowed by court order] * * * were rejected by the trial judge."[3]

In order to solve the several problems presented, this court must first interpret the meaning of the July 5th order. It is our view that this judgment superseded the minute orders of the court and that the previous orders have efficacy only to the extent they assist in resolving any ambiguities in the final order of the court. Stock Growers' Finance Corp. v. Hildreth, 30 Ariz. 505, 249 P. 71 (1926); Brown v. Peterson, 27 Ariz. 418, 233 P. 895 (1925); McFadden v. McFadden, 22 Ariz. 246, 196 P. 452 (1921).

It is clear that the amount in the estate savings account at the time of filing the final account is the total estate receipts less the amounts allegedly withdrawn under court order. The final written order signed by the court categorically approves the "account" and disburses to Penni the balance in the savings account, less only certain expenses of administration and withdrawals which do not include any allowance for expenditures prior to March 1961. Hence,

2. Again, there is no explanation in the record why these diverse items should be combined in this manner.

3. Appellee's brief, at 3.

we find the trial court's order to be a clear and unambiguous approval of the accounting based on the amounts withdrawn under court order.

While we recognize that the amount allowed to the guardian as a fee ($874.45) is an odd figure, and may have been arrived at by a process of offsetting unjustified by the evidence, the final written order unequivocally establishes this as the value of the services of the guardian.

■■■ The parol evidence rule is applicable to judgments of a court. City of Glendale v. Skok, 6 Ariz.App. 342, 432 P. 2d 597 (1967). Merely because this judgment adopts an odd figure as the value of the guardian's services does not in our opinion render the judgment ambiguous. Therefore, we accept the written judgment at its face value, without indulging in speculation as to the reasoning employed in reaching this particular result. See Wigley v. Whitten, 78 Ariz. 88, 276 P.2d 517 (1954), opinion adhered to 78 Ariz. 224, 278 P.2d 412 (1955).

Being satisfied that the order from which appeal is taken did not make any allowance for expenditures prior to the court order of March 1961, it is unnecessary to consider the appellant's contentions (1) that the trial court did not have jurisdiction to determine the validity of any such claim in this accounting proceeding,[4] (2) that laches and the statute of limitations bars this claim,[5] and (3) that it must be presumed these expenditures were provided by the mother and her stepfather with no intent of reimbursement, because during the period of these expenditures Penni had insufficient estate, after the investment of the $2200 in the home, from which these charges could have come.[6]

In defending the account rendered upon the basis of the interim support orders, the guardian places heavy reliance upon a dictum statement of our Supreme Court in Estate of Sorrells, 58 Ariz. 25, 117 P.2d 96 (1941), as follows:

"We are satisfied that the law of Arizona is that if a guardian secures the approval of the probate court in advance to a disposal of the ward's funds, such disposal may not be questioned, except for fraud, in a settlement of the guard-

4. This contention appears to have some merit. Our probate and guardianship statutes are said to have been adopted from California (see historical notes in A.R.S. Tit. 14, Chs. 3 through 6 inclusive). The following appears to be a statement summarizing various decisions in California:
"§ 161. Limited Scope of Court's Power to Settle Accounts.—The court that has jurisdiction to settle a guardian's account has no power to hear and determine a disputed claim against the ward's estate. Such an issue is the proper subject of an ordinary civil action and can be brought before a court only by such an action. There is no statutory provision governing the relation of guardian and ward that gives the probate court jurisdiction to determine contests between alleged debtors and creditors, and there is no provision at all for presentation of a claim to a guardian. It follows that a demand by the mother of minor children, of whose persons she has custody, that the guardian of their estate be compelled to refund moneys she spent in giving the children board, lodging, and clothing does not fall within the jurisdiction of the court that settles the guardian's account, even though the guardian is duty bound to support and educate the ward out of the income and profit of the ward's estate if it is sufficient for that purpose." 24 Cal.Jur.2d Guardian and Ward, at 347.

5. No law is cited to support this contention, and if the mother had been making claim for estate moneys expended in good faith upon the support, education or maintenance of the ward, this defense would seem to be untenable, see In re Beisel's Estate, 110 Cal. 267, 40 P. 961, 963 (1895).

6. This contention would seem to have substantial basis. In Estate of Harris, 16 Ariz. 1, 8, 140 P. 825, 828 (1914), our Supreme Court said:
"The criterion for determining whether a past maintenance should be allowed is whether a chancery court would have authorized it in advance."
See also In re Schluter's Estate, 209 Cal. 286, 286 P. 1008, 1009 (1930).

ian's account." 58 Ariz. at 40, 117 P.2d at 102.

It is the guardian's contention here that no fraud having been shown, the interim support orders are conclusive.

A guardian of a minor's estate is a trustee and owes the highest degree of good faith to care properly for the estate of the ward. In re Guardianship of Carlon's Estate, 43 Cal.App.2d 204, 110 P.2d 488 (1941); and see Bell v. Bell, 44 Ariz. 520, 540, 39 P.2d 629, 637 (1934); 24 Cal. Jur.2d Guardian and Ward § 3, at 200; and 25 Am.Jur. Guardian and Ward § 205, at 128. While it is proper to apply for and receive a court order allowing a certain set sum per month for the support of the ward, In re Boyes' Estate, 151 Cal. 143, 90 P. 454 (1907), we conceive that there is an implied fiduciary obligation to expend the amount allocated for the purposes indicated in the petition—in this case for the care of the ward.

When there has been a breach of a fiduciary duty, our Supreme Court has considered that a "constructive fraud" has been committed. Hassenpflug v. Jones, 84 Ariz. 33, 38, 323 P.2d 296 (1958); Brazee v. Morris, 68 Ariz. 224, 227, 204 P.2d 475 (1949); Estate of Sullivan, 51 Ariz. 483, 495, 78 P.2d 132 (1938); Bell v. Bell, 44 Ariz. 520, 539, 39 P.2d 629, 637 (1934).

Even if the guardian had complied with her statutory duty to file annual accounts, see A.R.S. § 14–1002, a settlement of a guardian's account in pursuance of statute is not binding upon the minor, but only "prima facie evidence" of the correctness of the account, A.R.S. § 14–667,[7] and see In re Di Carlo's Estate, 3 Cal.2d 225, 44 P.2d 562, 99 A.L.R. 990 (1935)

and Annot., 99 A.L.R. 996. We do not believe the interim, ex parte, orders here can have any greater efficacy.

In settling the accounts of a fiduciary, considerable discretion is vested in the trial court in passing upon the reasonableness of charges made. 24 Cal.Jur.2d § 76, at 269. If there were a conflict in the evidence as to whether the amounts withdrawn by the guardian under court order were necessarily spent for the ward's benefit, we would be constrained to affirm the decision rendered below. However, in this case, the evidence is clear that all of the moneys withdrawn were not disbursed for the benefit of the ward. This is made evident by the testimony of the guardian that all moneys withdrawn from the ward's account were commingled with her own funds in her personal checking account and that the detailed accounting filed with the court included *all* disbursements made for Penni's benefit. In describing the method of preparation of this account, the guardian testified she maintained a "master accounting book" in which "every expense for the month was entered." She further maintained that:

> "Every receipt that was ever received or bill that was mailed to me or I received has been maintained in cash. If there was not a receipt I have my cancelled check."[8]

The mother is in the best position to know whether these accounts are complete. There is a diversity of authority as to whether a party is bound by his own testimony under these circumstances even if there is conflicting evidence in the record. See Annot., 169 A.L.R. 798, at 815–826. However, there is no testimony in this rec-

---

7. A.R.S. § 14–667 reads:

"The settlement of the account and allowance thereof by the court is conclusive against all persons interested in the estate *except that persons under legal disability may move for cause to reopen and examine the account, or may proceed by action against the executor or administrator, either individually or upon his bond, at any time before final distribution.* In an action brought by such person, *the allowance and settlement of the account is prima facie evidence of its correctness.*" (Emphasis ours)

8. This, and other testimony of similar vein, is found in the transcript of testimony, at 18, 19 and 32.

ord to gainsay these assertions of completeness. Therefore, for the purposes of this litigation, insofar as the assumption is adverse to the legal posture sought to be taken in this action by the mother, it must be assumed these accounts reflect all expenditures made in Penni's behalf. Perry v. Hanover, 314 Mass. 167, 50 N.E.2d. 41 (1943); and see 9 Wigmore, Evidence § 2594(a), at 597–601; and 32A C.J.S. Evidence § 1040(3), at 784.

■ Accordingly, though the court order tested here approved the accounting based on court order, we are constrained to test this order by the detailed accounting for the period of time covered by these court orders. For, under the undisputed facts, to the extent that the withdrawals under court order exceeded proper charges against the ward's estate as shown on the detailed accounting, the trustee necessarily benefited personally from the estate of the child and the settlement by the lower court of the lump sum withdrawals would be an abuse of discretion. Under this view, we find it unnecessary to pass upon the appellant's contention that the guardian had a duty to cause the support payment order to be abrogated after Penni left the home.[9] Amounts actually expended for the benefit and welfare of the ward may be allowed even when there is no previous authorization by court order. In re Clanton's Estate and Guardianship, 171 Cal. 381, 153 P. 459 (1915); In re Boyes' Estate, 151 Cal. 143, 90 P. 454 (1907).

■ In taking this view of the adjudication rendered below, it is apparent that at least the guardian must be charged with the sum of $457.76, which is the excess of withdrawals from the ward's account over and above the itemized expenditures reported by the guardian during the period of time from March 1961 through July 1966. We see no basis to offset this over-withdrawal against any of the claimed disbursements occurring prior to March 1961, because the court's order disallowed all such

claims and there was no appeal from that order by the mother.

We now evaluate the attacks made upon the detailed account. The appellant objects to the amounts taken for church contributions. Under the detailed accounting for the period of March 1961 through July 1966, Penni was charged with $634.05 as one third of all contributions made by the family to a church. We believe applicable law to be stated in In re Hall's Guardianship, 31 Cal.2d 157, 168, 187 P.2d 396, 402 (1947):

> "While appellants argue that 'neither a general guardian nor a court has the power to dispose of a ward's property by way of a gift' [citation], such rigid principle has its exception where allowances from the surplus income of the estate are sought as 'donations for charitable and religious purposes' and with the object of 'carrying out the presumed wishes of' the incompetent person [citations]."

■ It is our view that there was no "surplus income" in this estate so as to justify these gifts. There is no dispute but what the total income from the estate over the five-year period with which we are concerned consisted of $3,510.46 in dividends on two savings accounts, obviously less than required for necessities. The ward has taken the position that she does not object to ten per cent of her income being donated, and we accept this as the appropriate disposition of this particular controversy. On remand to the trial court, the guardian should be surcharged the sum of $283 for items claimed on the account for donations to the church which are in excess of the ten per cent.

The ward next complains of being charged one half of the maintenance costs of the home, pointing out that this home was occupied by two other persons (mother and Kim Lona), and for periods of several months by the mother's father, her second husband and her niece. Further, from June

---

9. This contention would seem to have some basis. See 39 C.J.S. Guardian and Ward § 62, at 105.

1964 the ward did not live in this home at all.

As we have previously indicated, the settlement of a guardian's accounts leaves room for considerable discretion in the court. The prorating of expense between the estates of several children in a family on a reasonably fair basis should be sustained. In re Boyes' Estate, 151 Cal. 143, 90 P. 454 (1907). While usually a mother should not be compensated for taking care of her own children, there are circumstances under which this may be proper. Boyes' Estate, 90 P. at 460. In the case at bar, the mother testified it was necessary for the welfare of her children that she be a homemaker, thus forfeiting employment opportunities, and that her only income during most of the period with which we are concerned was $81 per month from social security. Accepting this testimony, the trial court may have believed it appropriate that the mother have a "free ride" as far as the maintenance of the home was concerned so long as the family lived together. The extent to which Kim Lona's estate should or did contribute to this maintenance is not established by the record. We see no necessity to disallow amounts charged the ward's estate for maintenance costs prior to June of 1964.

However, from June of 1964, when Penni became self-supporting and it was definitely understood between the mother and the daughter that the daughter would no longer be living in this home, we believe it was not just or equitable to charge the ward's estate one half of the maintenance of this home being occupied by others. There is substantial law to the effect that when a cotenant is in sole possession of the jointly owned estate, such possessor has the sole obligation to maintain the property. See 20 Am.Jur.2d Cotenancy and Joint Ownership §§ 56 and 62, at 146 and 153; and 86 C.J.S. Tenancy in Common § 67, at 446.

Moreover, substantially all of this "expense" was for compensation to the mother for caring for the joint property. It is well established that a cotenant is not entitled to compensation for services rendered in the care and management of the estate in the absence of agreement. Combs v. Ritter, 100 Cal.App.2d 315, 223 P.2d 505 (1950); Keithline v. Keithline, 106 Colo. 400, 105 P.2d 1086 (1940); and see 86 C.J.S. Tenancy in Common § 68g, at 457. Accordingly, it is our view that the guardian must be surcharged with the sum of $1,-399.24 shown in the itemized account as having been charged against this minor's estate for maintenance of and utilities for this home from July 1964 through July 1966.

The appellant challenges the expenditures shown for one half of the mortgage payments due upon the home. It is the appellant's contention that there was no authority given by the court to mortgage the ward's estate [10] and that, therefore, all payments upon this mortgage were illegal and not a proper subject of credit to the guardian. Whether or not the mortgage on this property is valid as to the ward's interest is not before us in this action. We are only here concerned with whether under the facts, viewed favorably to support the decision below, it is "just and equitable" that the guardian be allowed a credit for expenditures on this property. In re Clanton's Estate and Guardianship, 171 Cal. 381, 153 P. 459, 462 (1915). Generally, if a trustee has benefited a cestui's estate, even by an unauthorized expenditure, he is entitled to reimbursement. Restatement (Second) of Trusts § 245(2), at 618.

The evidence does not require a disallowance of these payments. Evidence in the record indicates this home was worth $20,000, subject to a mortgage of $9,779.80 at the time of the final account. The total amount shown as paid on this property and

10. See A.R.S. § 14–806, subsec. C and § 14–1061 et seq., for statutory pro- cedure for executing mortgage encumbering ward's estate.

approved by the lower court is $6,890.86.[11] Penni has had the joint use and enjoyment of this home for most of the period with which we are concerned and the legal right to the joint use and enjoyment at all pertinent times. Though we do not approve of the manner in which this investment was made, without full disclosure to the court as to the encumbrance being assumed by the ward's estate, we cannot say as a matter of law that the amounts paid upon this mortgage may not be allowed in the final settlement of the guardian's account. See In re Beisel's Estate, 110 Cal. 267, 40 P. 961 (1895).

■■■■ . The ward complains the guardian did not account for personalty purchased in part with estate funds. However, the appellant has not pointed out any specific expenditures in the accounts filed which were for the purchase of personal property. We therefore dismiss this contention as not having been properly raised on appeal. Mantovani v. Green, 90 Ariz. 376, 368 P.2d 448 (1962).

■■■■ The appellant asks this court to declare that the ward is the owner of the mother's one-half interest in the home jointly purchased. A guardianship proceeding is one in rem or quasi in rem, the subject matter being the estate of the ward. 24 Cal.Jur.2d Guardian and Ward § 163, at 348. In such a proceeding, the court has jurisdiction to determine between the estate and the guardian what properties of the ward have come into the guardian's hands. Estate of Nolan, 56 Ariz. 366, 108 P.2d 391 (1940); In re Vucinich's Estate, 3 Cal.2d 235, 44 P.2d 567 (1935). But there is no claim made here that the one-half interest of the mother was conveyed to the ward or acquired with estate funds—only that the mother is bound under some unspecified

legal theory by her offer to convey this property which was filed in this proceeding after the ward's majority. No authority is cited for the proposition advanced and we decline to adopt it. It is our view that such an offer does not ipso facto render the mother's one half of this property a part of the ward's estate, so as to bring it within the subject matter of this special proceeding. Cf. Fernandez v. Garza, 83 Ariz. 318, 320 P.2d 948 (1958); and In re Jacob's Estate, 81 Ariz. 288, 305 P.2d 438 (1956).

■■■■ Nor do we believe it proper in this proceeding to charge the guardian with a portion of the mortgage payments paid out of the ward's bank account by stipulation of counsel during the pendency of this litigation. The stipulation does not indicate how these payments are to be charged nor the amount of the total payments. Generally, the court in a guardianship proceeding is not concerned with transactions occurring after the majority of the ward. Curtis v. Devoe, 121 Cal. 468, 53 P. 936 (1898). Where the guardian continues to act as such and to expend or receive moneys for the estate after the ward's majority, an exception to this general rule is recognized and the state of the accounts should be settled in the guardianship proceeding. In re Boyes' Estate, 151 Cal. 143, 90 P. 454, 457–458 (1907). But, the expenditures here were made not in carrying on the guardianship, but in pursuance of stipulation by these two litigants, mother and daughter, both of majority. Under these circumstances, we believe it appropriate that the liabilities and equities arising by reason of the payment of the ward's money in this fashion be determined in a plenary action.[12]

■■■■ The appellant complains of the allowance of guardian's accountant's and attorney's fees by the trial court. These are

11. This is derived from monthly payments shown on accounting from March 1961 to July 1966, plus the $2200 "down payment."

12. See 24 Cal.Jur.2d Guardian and Ward § 162, at 347, for comment on limited nature of jurisdiction in guardianship

proceeding, and see 20 Am.Jur.2d Cotenancy and Joint Ownership § 58, at 147–49 and 86 C.J.S. Tenancy in Common § 68, at 448, for discussion re right of cotenant to reimbursement and lien for moneys expended to protect jointly owned property.

matters as to which the trial court has a substantial degree of discretion in determining what is reasonable under the circumstances. In re Clanton's Estate and Guardianship, 171 Cal. 381, 153 P. 459 (1915); and see 24 Cal.Jur.2d Guardian and Ward §§ 169 and 170, at 354–58. As to all of these allowances, except that for attorney's fees incurred in the instant litigation itself, we see no reason to disturb the findings made below. However, we regard the instant litigation to be one in which the guardian is defending her personal position in a contest brought by the ward for good cause. Under these circumstances, a charge against the estate of the ward for the payment of the guardian's attorney's fees in this litigation ($850) is not proper. In re Lissner's Estate, 233 Mo.App. 1121, 129 S.W.2d 1067 (1939); Morris' Guardianship v. Cusack, 145 Neb. 319, 16 N.W.2d 442, 156 A.L.R. 932 (1944); and see 25 Am.Jur. Guardian and Ward § 178, at 110; and 24 Cal.Jur.2d Guardian and Ward § 169, at 355; cf. Estate of Nolan, 56 Ariz. 366, 108 P.2d 391 (1940). For the same reason, we do not allow the guardian's claim for attorney's fees on appeal.

The appellant seeks a new trial by reason of allegedly newly discovered evidence—a deposition of Penni's father taken in the divorce action which may indicate additional contributions to her support by him beyond those shown in the detailed accounting filed by the guardian. In our view, the trial court disallowed any reimbursement to the guardian for the period prior to March of 1961. Hence, the newly discovered evidence could not affect the result reached and we see no possible prejudice in the denial of the new trial.

The appellant, during the pendency of this appeal, moved to supplement the record by inclusion of a certified copy of the "Annual Account and Report" filed by appellee in the Estate of Kim Lona Fong, a minor. It is the appellant's contention that this report will show no loans were made from the Fong Estate to the Purton Estate and that the mother is seeking to charge the estate of Kim with one half of the maintenance of the jointly owned home.

This report was filed on March 6, 1968, some eight months subsequent to the judgment which is the subject of this appeal. The appellant contends that this supplementation of the record is essential to "prevent manifest injustice."

Generally speaking, appellate review is limited to the record on appeal. State Automobile & Casualty Underwriters v. Engler, 90 Ariz. 321, 367 P.2d 665 (1961). We do not consider making an exception to this general rule here because even if the matters alleged to be contained within this extraneous document were to be considered, they would not in our opinion require upsetting the trial court's judgment beyond that which results from this opinion.

For the reasons stated, the judgment settling the guardian's account is affirmed except as to surcharges and disallowances totaling $2,990 which are required by this opinion and as to these items, the judgment below is reversed. The superior court is directed to enter an appropriate final judgment in accordance with the views herein expressed.

HATHAWAY, C. J., and KRUCKER, J., concur.